**TEXAS EMPLOYERS' INS. ASS'N v. BARRON.** (No. 2352.)

Court of Civil Appeals of Texas. El Paso. Oct. 10, 1929.

Rehearing Denied Nov. 7, 1929.

R. T. Bailey and Leachman & Gardere, all of Dallas, for appellant.

Templeton & Templeton, of Fort Worth, and Paul Moss, of Odessa, for appellee.

HIGGINS, J. This suit was brought by appellant, the alleged insurance carrier, to set aside an award against it, made by the Industrial Accident Board in favor of appellee. Omitting averments usual in such cases, appellee based his right of recovery upon the Workmen's Compensation Act (Rev. St. 1925, arts. 8306–8309, as amended), as an employee of the Atlantic Oil Production Company working in Crane county, upon the following allegations, to wit:

"Said defendant went to work for said company, on their lease known as 'University C' lease, as a gauger of oil, at a daily wage of, to wit, $5.00 per day, and he continued to work for said company in this capacity and at said wage, for about one month. On or about the 15th day of September, 1927, said defendant's work for said company was changed, and he was then employed and put to work by said company, as head roustabout, or gang foreman, for the same employer, on the same lease, and occasionally on its leases B and E, in which he was thereafter continuously employed, at a uniform daily wage of six ($6.00) dollars per day, until he was injured and had to give up his work, on, to wit, the 9th or 10th day of March, 1928, as hereinafter stated.

"While he was thus engaged, he was working for his said employer on said leases, and was in charge of a gang of men, who, like himself, were engaged in working on or about active oil and gas producing wells, pulling therefrom and replacing therein rods and tubing used in the production of oil and gas; and also in cleaning out gas and oil separators, repairing oil rigs; ditching, and taking up and laying pipe lines, and other similar work on and about said leases.

"In doing such work, defendant was compelled to work, and he did work, when pulling tubing from said wells, in an atmosphere which was liable from time to time to be permeated and heavily charged with poisonous gas which was from time to time permitted to escape from said wells, and he was thus forced to and did at times inhale the air thus charged with such poisonous gases as it was so released from said wells, as hereinafter stated; whereby his eyes, ears, mouth, nose and lungs were all irritated, inflamed and poisoned, and he was seriously injured and disabled, and was finally forced to discontinue such work, as stated below.

"This defendant says that it was then and there entirely practicable, by taking proper precautions, to confine within said well, so as to prevent its escape therefrom, the gas which was permitted to escape from said wells. But said employer negligently and carelessly neglected and refused to exercise such precautions, and it negligently and carelessly permitted such gas to accidentally escape from said wells, and to poison the atmosphere in the vicinity thereof, as above stated, to this defendant's great damage.

"As the direct and proximate result of the negligence of said employer, in failing to take the necessary precautions to prevent the escape of the gas from said wells while this defendant and his men were doing their work in the course of their employment, such gas was permitted to accidentally escape from confinement in the wells, and was permitted to gather and settle in dangerous volume and quantities around and about said wells, and to mix and commingle with and to permeate the atmosphere in that immediate vicinity, so as to poison and render dangerous the air which said defendant and his men were forced to breathe while working there.

"On, to wit, the 9th, 10th day of March, 1928, while this defendant was engaged in the work of pulling tubing from well No. 4, and in the course of employment on said lease C, a great and excessive amount of the poisonous gases originating in said well, was accidentally permitted to escape from said well, and to gather in great and dangerous quantities in that immediate vicinity where this defendant was working; and he was thus forced to inhale and breathe and take into his system and into his nose, mouth, throat and lungs, large quantities of such gas as it came from said well, and of the air so heavily impregnated therewith; whereby his head and the nasal passages and sinuses thereof, and his eyes, nose, mouth, throat and lungs were then and there poisoned, irritated, inflamed and injured, that he was thereby so overcome and injured, that he was then and there forced to give up his employment, and to cease working altogether.

"This defendant avers that as the natural and proximate result of the inhalation of such gases, and the effect thereof on his system, he was rendered very susceptible to, and he has contracted and developed tuberculosis of the nose, head, throat and lungs, and that he now has such disease, particularly of his throat and lungs, from which he is now suffering and will continue permanently to suffer.

"He has also sustained serious and permanent injury to his head and his throat, from the inhalation of said gas, so that he is now an invalid and is unable to do any kind of manual labor.

"He verily believes and charges, that his injuries so sustained are permanent and incurable, and that he has been thus perma-

nently and totally disabled from ever again laboring or earning his own living. If defendant should be mistaken in charging that he contracted tuberculosis as a natural result of the sudden exposure to said gas, then, he charges, in the alternative, that if he had said disease prior to the time of said accident same was latent and inactive and that by said accident said disease was developed and made active and virulent and it has ever since so remained and that it has now become chronic and permanent.

"He further says that all such injuries were received in the course of his employment, and that same were the result of an accident injury compensable under the terms of the Workman's Compensation Act of this state."

Upon the answers returned to special issues, judgment was rendered in favor of appellee. Upon the view the majority have of the case it is necessary only to consider the assignment complaining of the refusal of a peremptory charge in appellant's favor. Appellee testified:

"I worked for them about 4½ months. As to what I was doing for them, will say, first, I was a gauger; and, second, I was head roustabout. The duties of a gauger are gauging the tanks that the wells are flowing in, and switching out of those tanks as they fill up, and checking up with the pipe lines gauges that makes the pipe line runs and making a daily report of the daily production on the wells. I worked for them a little over one month in that work. * * *

"During the time I was working for them as a head roustabout my duties were general lease work such as tubing up wells, pulling tubes, pulling rods, switching rods, laying pipe lines. On an average I had from three to five and six men under me. During the time I was working there I had some experience with gas coming from the wells. I will explain to the jury how that gas affected any one that came into contact with it:

"It was a poisonous gas, and if a man breathed it fresh out of the well before it was mixed into the air it would just knock you unconscious almost at one breath, and if a person worked any length of time it was irritating to your throat, nose, and it hit mostly your eyes. As to whether or not I know if it was poisonous to human beings, will say, I don't know if any tests have been made on it, but I have seen several men knocked out that wasn't unconscious from it. As to what I mean 'being knocked out,' will say, I have seen them fall unconscious and when they come to they would never know anything about it; I have seen them knocked out and carried to hospitals, and they would be almost crazy for two or three days after they had been carried in from it. * * *

"As to whether or not I remember of any experience I had with that gas prior to March 10th, or 9th, will say, well, I don't remember the dates. As to what experience I had with it, will say, well I had my eyes gassed a number of times, and was almost knocked out once as a gauger; there was oil flowing over the top and I had to go in there and shut off the tank and gas was coming clear around the tank. As to what I mean by 'gassed eyes,' will say, if you get that gas in your eyes it burns and hurts awful bad. As to what you do for it, will say, well, they treat your eyes—these doctors put some medicine in your eye for it. As to what extent those previous attacks that I had with my eyes affecting me, and how, will say, well, sometimes you would be nauseated with it and sometimes if you got your eyes gassed light it would not affect you very bad—you could have them treated, and at times it would almost run you crazy and you would be practically blind for a day or two, or longer.

"As to whether or not after those attacks I recovered to the extent I went back to work, will say, I did. As to whether or not after I would go back to work I would feel any inconvenience from those previous attacks, will say, well, I don't know; I can't say that I did. Sometimes I went back to work and my eyes were still partly gassed. I would say that would last on an average of three or four days.

"As to whether or not I remember what I was doing on the 9th and 10th days of March, 1928, will say, I was pulling tubing I think on one of those days; I was pulling tubing. When you release a well you open the hole up wide open. As to what effect that has on releasing the gas that is in the well, will say, it releases it wide open. As to where the gas came from that I found there that day, will say, it came out of the well. We began to work at 7 o'clock that morning probably might have been 7:15 by the time we got our tools and got over there.

"This well was making quite a bit of gas and oil, but the tubing was up at the top of the well, and as it went down to the bottom—when we started off the well wasn't making much gas right at first; making some all time, but the longer it sets there and being agitated by pulling that tubing through it, it collects more force and gets worse and worse, and the well was heading—making heads of gas and oil. We were in gas pretty well all the time all day, and the wind was kind of blowing towards me more than it was the other boys. The roustabouts could get off the floor quicker than I could as I have to shut this machinery down, and catch those pipes. I worked in that gas until I suppose about 3:30 that evening, being over charged with it several times and having to run out and come back in there, and the last time I was gassed I wasn't knocked unconscious; I could get out of the way and did get out myself, but I was so sick and near knocked out, until the truck driver carried me to the hospital to the nurse, and then carried me on

home, or where I was living at the Atlantic Camp.

"As to whether or not the flow was heavier than usual that day, will say, well, I wouldn't pull tubing every day, just maybe once or twice a week we had a tubing job. I could not say it was heavier than it was sometimes, and probably might not have been as heavy then as it was other times. I did not have a chance to get out of the way sooner. As to why I did not have a chance to get out of the way sooner, and what there was there to confine me to that place where the gas was flowing, will say, I had to shut that motor down and catch that pipe. As to whether or not that is the only way I could do that work, and the only way provided, will say, well, they could have used different ways of doing it. That was the only way provided there. As to whether or not any of the others of my crowd was affected by the gas there that day, will say, I was carried in, that is the last I know about it; I never saw one of my roustabouts. It was about three thirty when I was finally stricken. I was knocked out so that I could not work. I was so sick, so nauseated that I could hardly stand up at all and my eyes hurt me. * * * As to whether or not I could tell whether I had breathed that gas from my feelings, will say, yes, sir. As to how that affects you, will say, it makes you sick. As to just how I felt from breathing that gas, will say, I was just so sick, so nauseated I just couldn't go any longer that was all. * * *

"I told Mr. McDowell that I was going to quit that next day; I told him that, as I just stated, the next day after I come back out there. I told him that I was going to quit; for him to get him a man, but I would stay around out there until he got him a man. I told him why I was going to quit. I told him about being gassed; I told him about what happened there. I did not tell him how it affected me. I told him it made me sick. It was the next morning that I told him I was going to quit, and that I would stay there until he could get another man. I told him why I was going to quit. I told him that the gas was killing me; I couldn't stand it; I would have to get out of it; that I wasn't getting along very well. I stayed around on the lease the balance of that day and the next day, and I don't remember whether it was the next day a man came out, but I stayed there two or three days. I stayed there to be of any assistance that I could until he got a man in my place. I quit; I don't remember when I quit. I don't remember whether I quit on the 11th or 12th of March, but it was about that time."

His testimony further shows that about three weeks after quitting work for the Atlantic Oil Producing Company appellee had a hemorrhage from the lungs and was pronounced tubercular, from which disease he still suffers and is incapacitated.

The medical experts testified, and it is common knowledge, that tuberculosis is caused by a specific germ, the tubercule bacillus, and not otherwise. Their testimony also shows that inhaling the gas by Barron had no relation to the disease from which he was suffering, except that it would lower his vitality, irritate the lungs, and furnish a better opportunity and favorable field for the development of the germ and disease. The testimony shows that the Crane county oil field was impregnated with hydrogen sulphide gas, and while such gas was not always and at all places present in the atmosphere it was nevertheless in a measure an ever-present and common menace to those working in the field.

In Ætna, etc., v. Graham (Tex. Com. App.) 284 S. W. 931, 932, Miss Artie Graham was employed by manufacturers of shoe polish. It was her duty to stir and boil various chemicals used in the manufacture of shoe polish. From her duties, and as incident thereto, arose certain gases, fumes, and powders, all more or less poisonous and irritating. She inhaled these fumes, contracted tuberculosis, and died therefrom. In that case Judge Powell said:

"Considered most favorably from the standpoint of defendants in error, it is conclusively shown that Miss Artie was exposed to the natural surroundings of her employment; that such exposure gradually developed a disease known as tuberculosis, from which she died in about two years after her employment ceased. In other words, her death was due to what is called an industrial or occupational disease, and not to an accidental injury. It was her duty to stir and boil various chemicals used in the manufacture of shoe polish. From her duties, and as incident thereto, arose certain gases, fumes, and powders, all more or less poisonous and irritating. She inhaled some of these fumes. She was necessarily exposed to the dangers incident to the character of her employment or occupation. She suffered no accidental injury, and therefore her claim is not compensable."

And in reviewing the Jackson Case (Tex. Com. App.) 265 S. W. 1027, it was further said:

"We think the Jackson Case, supra, a very much stronger one for the claimant than the one at bar. Jackson suffered from pneumonia, a disease. It was brought on by exposure which was incident to his trucking duties for his employer. But, unlike the case at bar, the disease there developed suddenly from what seems to have been a succession of more than ordinary exposure. In each case, the disease was the direct result of exposure incident to the occupation or industry in which the employee was engaged. We think Judge Bishop's holding is sound. If so, there is no escape, as we see it, from the conclusion that Miss Artie's death was not due to an

accidental injury within our Compensation Act. Our statute has never gotten away from the central thought that the injury must be accidental in its nature. It is only upon that theory that the act itself has been held constitutional by our Supreme Court. It is clear to us that, so far as our Supreme Court has spoken, it has shown its approval of the rule, well-nigh universal elsewhere, that recovery cannot be had for what is termed an occupational or industrial disease. We think the Industrial Accident Board correctly decided the case at bar."

See, also, Gordon v. Travelers' Ins. Co. (Tex. Civ. App.) 287 S. W. 911.

■ Upon the facts disclosed by this record the majority regard the Graham and Jackson Cases as decisive and preclude recovery by appellee. Appellee cites a number of cases in this state, where recovery was allowed in case of death or incapacity from disease brought about by accidental injuries sustained in the course of employment. ·These cases are inapplicable, for the reason that the injuries in those cases were clearly accidental, within the purview of the Workmen's Compensation Act.

The majority regard this case as differing in no material respect from the facts shown in the Graham Case, and upon the authority of that and the Jackson Case the judgment herein is reversed, and rendered for appellant.

PELPHREY, C. J. (dissenting). The writer finds himself unable to concur in the holding of the majority that the evidence in this case shows that the injury suffered by appellee was the result of an industrial or occupational disease, and falls within the rule laid down in Ætna, etc., v. Graham (Tex. Com. App.) 284 S. W. 931, or that the holdings in that case and in Texas Employers' Ins. Ass'n v. Jackson (Tex. Com. App.) 265 S. W. 1027, 1029, are decisive of the questions here involved.

The record shows that appellee worked for the Atlantic Production Company in the Crane oil field for a period of about 4½ months; that there was some poisonous gas in the field at all times; that it was most injurious when it first came out of the well, before being mixed with the atmosphere; that appellee was slightly gassed on some 15 or 20 occasions before the gassing on either the 9th or 10th of March, 1928; that he resumed his labors after each of the prior gassings with very little loss of time; that while pulling tubing on a well on the above date he received what he designates as the worst gassing of any received by him; that his eyes, nose, and throat were highly inflamed as a result thereof; that shortly thereafter he began to spit up blood; that he now has an active case of tuberculosis; that the right side of his nose is closed, and he suffers from shortness of breath; and that these symptoms have arisen only since the last gassing.

The testimony is uncontradicted that tuberculosis cannot exist without a germ, and that inhaling the gas alone will not produce it. There is further testimony to show that inhaling the gas closes the air cells of the lungs by swelling, and that any acute respiratory condition may flare up a latent tuberculosis. The physicians who testified in the case refused to say whether appellee's condition was due to one or to the several gassings. Appellant contends that the court should have instructed a verdict in its favor (1) because the evidence fails to show that appellee's condition was the natural result of an accidental injury; and (2) that his own testimony shows an occupational disease.

The writer is of the opinion that the record is sufficient to show that the gassing on March 9th or 10th was accidental. Appellee had been employed in the field for 4½ months, and, according to his testimony, had been engaged in pulling tubing twice each week during that time. The gassings he had received before, according to his testimony, had affected only his eyes, and he had promptly recovered from them, and had resumed the arduous labor connected with his employment as a roustabout, while the gassing on that date was a result of the inhalation of the oil and gas as it came undiluted from the well in heads, the volume of which no one could foresee.

I am further of the opinion that an occupational or industrial disease is not shown by the record. According to my understanding of the numerous opinions which I have read, in which that question is discussed, an industrial or occupational disease is one which arises gradually and is incidental to the employment, and if, in this case, the record revealed only a series of gassings, which had gradually reduced the vitality of appellee, until tuberculosis had developed, then it might be said that it resulted from a condition brought about by and as a natural result of the employment.

Here, however, we have a series of minor gassings, and then one more severe than any of the others, by which the nasal passages were highly inflamed, some of the air cells of the lungs evidently closed by swelling, followed by a hemorrhage, and active tuberculosis. In the Graham Case, supra, the record showed that Miss Artie, whose duty it was to stir certain chemicals in a dye factory, was gradually weakened and her vitality reduced until she became the victim of tuberculosis and died. In that case the Commission of Appeals very properly held that her injury was not the result of an accident.

In the Jackson Case, the Commission of Appeals held that getting wet was not "damage or harm to the physical structure of the body," and therefore pneumonia contracted

from such wetting was not compensable under the Workmen's Compensation Act. That case differs from the case at bar, in that here we unquestionably have "damage to the physical structure of the body," evidenced by the inflamed eyes, nasal passages, and lungs.

I shall not discuss the other issues presented by appellant, but am of the opinion that the case should not be reversed upon the grounds discussed in the majority opinion.